**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JOEL MICHEL and LISA MICHEL, | ) | CASE NO. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EXACTECH, INC. and EXACTECH US, | ) | |
| INC. | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs Joel Michel and Lisa Michel, by counsel, for their Complaint against Exactech, Inc. ("Exactech" and Exactech US, Inc. ("Exactech US") (collectively "Defendants") state as follows:

**Allegations Applicable to All Counts**

1.      At all times relevant hereto, Plaintiffs Joel Michel and Lisa Michel were residents and citizens of Hamilton County, Indiana.

2.      On November 19, 2019, Plaintiff Joel Michel underwent total knee replacement surgery in Hamilton County, Indiana. An Exactech Optetrak System was implanted to treat his knee condition. The Exactech Optetrak System (hereinafter, "Defective Device") consisted of the following components: "Optetrak Tibial Tray Trapezoid, Cemented," "Optetrak Asymmetric Femoral Posterior Stabilized, Cemented," "Optetrak 3 Peg Patella Cemented," "Posterior Stabilized Tibial Insert" and "Simplex Bone Cement."

3.      Defendant Exactech, Inc. is a for-profit Florida corporation with its principal place of business at 2320 NW 66th CT, Gainesville, Florida, 32653. Exactech's stated business purpose is to "develop, manufacture, market, distribute and sell orthopedic implant devices, related surgical

instrumentation and biologic services to hospitals and physicians in the United States and internationally" and to introduce its products, including the Defective Device, into interstate commerce, either directly or indirectly through third parties or related entities.

4.      Exactech US, Inc., a wholly owned subsidiary of Defendant Exactech, Inc., is a for-profit Florida corporation with its principal place of business at 2320 NW 66th CT, Gainesville, Florida, 32653. Defendant Exactech Inc.'s U.S. sales and distribution activities are conducted by its wholly owned subsidiary Exactech US, Inc. and Exactech U.S., Inc. is engaged in the business of designing, developing, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing its products, including the Defective Device, into interstate commerce, either directly or indirectly through third parties or related entities. Collectively, Exactech, Inc. and Exactech US, Inc. are referred to in this pleading as "Exactech" or "Defendants."

5.      Defendants, directly or through their agents, servants, and/or employees designed, developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted and/or sold the Defective Device for the use as a total knee replacement.

6.      After implantation of the Defective Device, Plaintiff Joel Michel experienced pain and other symptoms and was ultimately diagnosed in 2023 with a failed left total knee arthroplasty.

7.      On November 19, 2023, and as a direct and proximate result of the Defendants' actions and inaction, Plaintiff Joel Michel required a total knee revision surgery to remove the failed Defective Device and replace it with a new total knee replacement system. The Optetrak knee replacement implant was defective, unreasonably dangerous, and caused permanent injury and damages to Plaintiffs.

8. On August 1, 2024, a further revision was required as a direct and proximate result of Defendants' actions and inaction.

9. The Defective Device failed and was defective because of aseptic loosening of the femoral and tibial components, substantial and defective polyethylene wear including particulate debris of the plastic polyethylene insert found throughout the knee area, polyethylene wear resulting in loosening of the device around the worn polyethylene insert area, and other failures of the Device.

10. As a result of the defective nature of the Optetrak knee replacement system, persons who were implanted with a Defective Device, including Plaintiff Joel Michel, have suffered, and may continue to suffer, severe and permanent personal injuries, including polyethylene wear and device failure, disbursement of the polyethylene into bone and other body structures, painful knee revision surgery to remove or revise the Defective Device, continued rehabilitation, medical care, and possible additional surgeries.

11. Defendants concealed, and continue to conceal, their knowledge of the Defective Device's unreasonably dangerous risks, including an increased risk of early failure, from Plaintiff Joel Michel, Plaintiff's medical providers, other consumers, and the medical community at large.

12. Plaintiffs bring this action for personal injuries suffered as a proximate result of being implanted with the Defective Device. Plaintiffs accordingly seek damages, restitution, and all other available remedies provided to Plaintiffs.

13. This Court has jurisdiction over Defendants in this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and because the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and

because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

14. At all times relevant to this action, Defendants engaged, either directly or indirectly, in the business of designing, developing, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the Defective Device, within the State of Indiana with a reasonable expectation that the products would be used or consumed in this state, and thus regularly solicited or transacted business in this state.

15. At all times relevant to this action, Defendants were engaged in disseminating inaccurate, false, and/or misleading information about the Defective Device to health care professionals in the State of Indiana, including Plaintiff Joel Michel's health care professionals, with a reasonable expectation that such information would be used and relied upon by health care professionals throughout the State of Indiana.

16. Defendants engaged in substantial business activities in the State of Indiana. At all relevant times, Defendants transacted, solicited, and conducted business in Indiana through their employees, agents, and/or sales representatives and derived substantial revenue from such business in Indiana. Said activities including for the promotion, sale, and use of the Defective Device.

17. Further, Defendants committed torts in whole or in part against Plaintiffs in the State of Indiana. As such, this Court has personal jurisdiction over all named Defendants.

18. Venue is proper within this district pursuant to 28 U.S.C. § 1391 because Plaintiffs reside in this district and because a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

19.    At all times material hereto, Defendants designed, developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted and/or sold the Defective Device under various versions of the name "Optetrak."

20.    Upon information and belief, the first Optetrak knee device was implanted in 1994.

21.    Since 1994, Defendants have obtained 510(k) clearance for various Optetrak devices and tibial inserts including the Optetrak total knee replacement system as referenced above and the Defective Device.

22.    A typical knee replacement surgery, referred to as a total knee arthroplasty ("TKA"), is performed under general anesthesia. The primary indication for TKA is to relieve severe pain associated with arthritis and may also be used to correct knee trauma or minor knee deformities.

23.    During the TKA procedure, the surgeon removes any diseased bone, places a femoral implant onto the distal femur using surgical cement, implants the tibial tray using surgical cement, and implants a polyethylene product between the femoral implant and tibial tray.

24.    Defendants promoted their Optetrak devices as a system with nearly three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stresses.

25.    Defendants became aware of a high rate of early failures with the Optetrak products which required recipients of the Optetrak knee implant to undergo revision surgeries to remove the defective device.

26.    Despite actual knowledge of the increased risk of failure related to the defective nature of the Optetrak knee implant design, Defendants made the decision not to recall, stop

selling, or otherwise change the warnings for the affected devices until there was a suitable replacement approved for the U.S. market.

27.    Despite Defendants' knowledge of early onset failures of the Optetrak knee implants, Defendants continued to manufacture, promote, and distribute the Optetrak knee implants without alerting surgeons of potential increased risks of early onset failures of the Optetrak knee implants.

28.    Despite Defendants' knowledge of early onset failures of the Optetrak knee implants, Defendants continued to manufacture, promote, and distribute the Optetrak knee implants without changing, modifying or improving the Defective Device to address the increased risk of early failure.

29.    Despite Defendants knowledge of early onset failures of the Optetrak knee implants, Defendants never changed the labeling, marketing materials or product inserts to warn patients or physicians of the associated increased risks.

30.    Despite Defendants knowledge of early onset failures of the Optetrak knee implants, Defendants never alerted the FDA of the known increased risks.

31.    By 2012, Defendants had further clinical evidence that Optetrak knee implants were failing at a rate higher than promoted. Reports in the Manufacturer and User Facility Device Experience (MAUDE) indicate instances of revision due to "loose tibial component," "aseptic loosening," "pain and visible loosening," and "pain, limited mobility, knee swelling and sensitivity" due to "loose" joint. These early onset failure mode reports are representative of the increased rate of incidents of which Defendants had become internally aware.

32.    In 2013, complaints continued to be reported. Some examples include revision for "tibial loosening" just two years postoperatively, "revision due to tibial loosening," "during

revision, the tibial component was found to be loose and easily removed," "revision of knee component due to loosening," "revision due to pain and loosening."

33.    The complaints of early onset failures continued in 2014. Some examples include "revision due to tibial loosening", "tibial loosening", "revision of optetrak knee components due to tibial loosening", "revision due to pain and loosening", "revision of optetrak knee components due to aseptic loosening", several reports described as "revision of knee components due to tibial loosening", and "revision of optetrak knee components reportedly due [to] aseptic loosening"

34.    Upon information and belief, instead of warning consumers and the medical community about the increased failure rates with its Optetrak devices, including but not limited to the Defective Device, Defendants engaged in a "silent recall" campaign where it slowly replaced all tibial trays with a new, more substantial design. Concurrent with this strategy of product replacement, Defendants also engaged in a campaign of misinformation where any incidents of early onset failure were blamed on surgeon specific factors instead of admitting to any issues with the product itself.

<strong><u>Federal Standards</u></strong>

35.    Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

36.    Pursuant to federal law, a device is deemed misbranded if, among other things, its labeling is false or misleading in any particular way, or if it is dangerous to health if used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

37.    Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit

introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices. In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to a death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to a death or serious injury. Federal law also requires the FDA to establish regulations requiring a manufacturer of a medical device to promptly report to the FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation federal law which may present a risk to health. *See* 21 U.S.C. § 360i.

38.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation, packaging, storage, and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe, effective and otherwise in compliance with federal law. *See* 21 U.S.C. § 360j(f).

39.     The regulations requiring conformance to good manufacturing practices are set forth in 21 CFR § 820 et seq. The Federal Register explains that the Current Good Manufacturing Practice (CGMP) regulations do not prescribe the details of how a manufacturer must produce a device because the regulations must apply to a variety of medical devices. Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured, and the manufacturing process employed. Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

40.     Pursuant to 21 CFR § 820.1(c), the failure to comply with any applicable provisions in section 820 renders a device adulterated under section 501(h) of the Act. *See* 21 U.S.C. § 351.

41.     Pursuant to 21 CFR § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. *See* 21 CFR § 820.3(v).

42.     Pursuant to 21 CFR § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

43.     Pursuant to 21 CFR § 820.30(a), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

44.     Pursuant to 21 CFR § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

45.     Pursuant to 21 CFR § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

46.     Pursuant to 21 CFR § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots, batches, or their equivalents. Design validations shall ensure that the devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

47.   Pursuant to 21 CFR § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

48.   Pursuant to 21 CFR § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or, where appropriate, verification, review, and approval of design changes before their implementation.

49.   Pursuant to 21 CFR § 820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.

50.   Pursuant to 21 CFR § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification method, process, or procedure.

51.   Pursuant to 21 CFR § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control systems to verify that the system, including necessary equipment, is adequate and functioning properly.

52.   Pursuant to 21 CFR § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or products by substances that could reasonably be expected to have an adverse impact on quality.

53.   Pursuant to 21 CFR § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirements and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use.

54. Pursuant to 21 CFR § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality in order to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

55. Pursuant to 21 CFR § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer is required to validate computer software for its intended use according to an established protocol.

56. Pursuant to 21 CFR § 820.72, each manufacturer shall ensure that all inspection, measuring, and test equipment, including mechanical, automated, or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results. Each manufacturer must establish and maintain procedures to ensure that equipment is calibrated, inspected, checked, and maintained.

57. Pursuant to 21 CFR § 820.75(a), where the results of a process cannot be fully verified by subsequent inspections and testing, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing, by objective evidence, that a process consistently produces a result or product meeting its predetermined specifications. 21 CFR § 820.3(z)(1).

58. Pursuant to 21 CFR § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring internal processes and establish control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualified persons.

59. Pursuant to 21 CFR § 820.90, each manufacturer also must establish and maintain procedures to control products that do not conform to specified requirements.

60.    Pursuant to 21 CFR § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventative actions.

61.    Based on information and belief, Defendants' knee implant devices are adulterated pursuant to 21 U.S.C. § 351 because, among other things, they failed to meet established performance standards, and/or methods, facilities, or controls used for their manufacture, packaging, storage or installation and are not in conformity with federal requirements. See 21 U.S.C. § 351.

62.    Based on information and belief, Defendants' knee implant devices are misbranded because, among other things, they are dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

63.    Based on information and belief, Defendants' knee implant devices are adulterated pursuant to 21 U.S.C. § 351 because Defendants failed to establish and maintain CGMP for its knee implant devices in accordance with 21 CFR § 820 et seq., as set forth above.

64.    Based on information and belief, Defendants failed to establish and maintain CGMP with respect to quality audits, quality testing and process validation for its knee implant devices.

65.    As a result of Defendants' failure to establish and maintain CGMP as set forth above, Defendants' knee implant devices were defective and failed, resulting in injuries to Plaintiff Joel Michel.

66.    If Defendants had complied with the federal requirements regarding CGMP, Defendants' knee implant devices would have been manufactured properly and would not have resulted in injuries to Plaintiffs.

**Causes of Action**

**First Cause of Action**
**Strict Liability – Manufacturing Defect Under the**
**Indiana Product Liability Act**

67.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

68.     Prior to Plaintiff Joel Michel's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak System for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

69.     The Defendants had a duty to manufacture the Optetrak System in a manner that prevents unreasonable risk of harm or injury to users and patients, including Plaintiff.

70.     The Defendants had a duty to distribute, market, and/or sell the Optetrak System without manufacturing and related packaging defects to prevent an unreasonable risk of harm or injury to users and patients, including Plaintiff.

71.     The Optetrak System manufactured by the Defendants were not reasonably safe for their expected, intended, and/or foreseeable uses, functions and purposes.

72.     The Optetrak System were not reasonably safe as manufactured, packaged, distributed, marketed and/or sold by the Defendants.

73.     The defects in manufacture of the System caused Plaintiffs' injuries.

74.     At all times herein mentioned, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak System, which was implanted in Plaintiff Joel Michel, such that it was dangerous, unsafe, and defective in manufacture. The defects in manufacture include but are not limited to:

a.     failure to package the polyethylene components of the Optetrak System in vacuum bags that contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery;

b.     that the materials used to package the Optetrak System was of an inferior grade or quality;

c.     that the Optetrak System as manufactured differed from Defendants' intended specifications;

d.     that Defendants failed to measure and/or test an adequate number of samples of Optetrak System on an ongoing basis;

e.     that Defendants failed to take corrective actions to eliminate or minimize further failures of the Optetrak System;

f.     that Defendants failed to perform adequate quality control or other such testing on the polyethylene inserts used in the Optetrak System to ensure they complied with required specifications and were not prematurely degrading while stored;

g.     failing to select appropriate third parties to package the polyethylene inserts used in the Optetrak System;

h.     failing to properly supervise and monitor the packaging of the polyethylene inserts used in the Optetrak System;

i.      that Defendants failed to exercise sufficient quality control to ensure the polyethylene inserts in the Optetrak System was safe for implantation in users and patients and would not degrade abnormally under average and regular use; and

j.      that Defendants violated applicable state and federal laws and regulations; and in all other ways.

75.     Defendants knew or reasonably should have known and been aware that the Optetrak System was defectively manufactured.

76.     The manufacturing defects in the Optetrak System existed when the device left the Defendants' control.

77.     Plaintiff's physicians implanted the System in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

78.     The System as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

79.     As alleged herein, Defendants knew or had reason to know that the Optetrak System caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

80.     The manufacturing defects of the Optetrak System presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

81.     The manufacturing defects of the Optetrak System presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when it was used and operated in a manner that was foreseeable to Defendants.

82.     Plaintiffs could not, by the exercise of reasonable care, have discovered the manufacturing defect and perceived its dangers or avoided injury.

83.     The Defendants are strictly liable for the defective manufacture of the Optetrak System; the distribution, marketing, and/or sale of the defectively manufactured Optetrak System; and the injuries sustained by Plaintiffs.

84.     By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff Joel Michel was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

85.     By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff Joel Michel was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

86.     As a direct, proximate and legal consequence of the defective nature of the System as described herein Plaintiff has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

87.     As a further direct, proximate and legal consequence of the defective nature of the System, Plaintiff has sustained and will sustain future damages, including but not limited to cost

of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress and pain and suffering.

## Second Cause of Action

## Indiana Product Liability Act – Design Defect

88.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

89.     Prior to Plaintiff Joel Michel's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak System for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

90.     Defendants had a duty to design and package the Optetrak System in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

91.     Defendants had a duty to distribute, market, and/or sell the Optetrak System with a design that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

92.     The design of the Optetrak System and corresponding packaging is defective and not reasonably safe for its expected, intended, and/or foreseeable uses, functions and purposes.

93.     The Optetrak System and corresponding packaging is not reasonably safe as designed, distributed, marketed, delivered and/or sold by Defendants.

94.     The defective design of the System and packaging received by Plaintiff's implanting surgeon caused Plaintiffs' injuries.

95.     At all times relevant to this action, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised,

marketed, distributed, and/or sold the Optetrak System, which was implanted in Plaintiff Joel Michel, such that it was dangerous, unsafe, and defective in design. The defects in the design include but are not limited to:

a.     that the Optetrak System has a propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients;

b.     failure to design the packaging for the polyethylene components of the Optetrak System in vacuum bags that contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery;

c.     that the materials used within the Optetrak System and packaging were of an inferior grade or quality than advertised and promoted by Defendants;

d.     Defendants failed to conduct adequate testing, including wear or other testing, on components, subassemblies and/or the finished Optetrak System as packaged and distributed;

e.     Defendants failed to test an adequate number of samples of Optetrak System on an ongoing basis;

f. Defendants failed to take adequate steps to specifically identify failure modes with the Optetrak System with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

g. Defendants failed to identify and/or note the significance of any testing that resulted in failure of the Optetrak System;

h. Defendants failed to take corrective actions to eliminate or minimize further failures of the Optetrak System;

i. Defendants failed to adequately design packaging specifications for the components, subassemblies, and/or the finished Optetrak System;

j. The polyethylene material used in the Optetrak System in conjunction with the inferior vacuum bags caused and/or contributed to the devices having a higher failure rate than other similar devices available at the time the Optetrak System were put on the market;

k. The polyethylene material used in the Optetrak System in conjunction with the inferior vacuum bags caused and/or contributed to the devices having a shorter effective lifetime than other similar devices available at the time the Optetrak System were put on the market;

l. The Defendants' method of designing the polyethylene insert and packaging increased the risk of users and patients suffering from pain, discomfort, injury and the need for revision surgery; and

m. that Defendants violated applicable state and federal laws and regulations; and in all other ways.

96. Defendants knew or reasonably should have known and been aware that the Optetrak System and packaging were defectively designed.

97. The design defects in the Optetrak System and packaging existed when the device left the Defendants' control.

98. Plaintiff's physicians implanted the System in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

99. The System as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

100. As alleged herein, Defendants knew or had reason to know that the Optetrak System caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

101. The System and packaging were defective in design and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the foreseeable risks exceeded or outweighed the purported benefits associated with the device.

102. The design defects of the Optetrak System and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

103. The design defects of the Optetrak System and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

104.    Plaintiffs could not, by the exercise of reasonable care, have discovered these design defects and perceived its dangers or avoided injury.

105.    The Defendants are liable under the Indiana Product Liability Act for the defective design of the Optetrak System; defective design of the packaging of the device; the distribution, marketing, and/or sale of the Optetrak System; and the injuries sustained by Plaintiffs.

106.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

107.    By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

108.    As a direct, proximate and legal consequence of the defective nature of the Optetrak System as described herein, Plaintiff has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

109.    As a further direct, proximate and legal consequence of the defective nature of the Optetrak System, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress and pain and suffering.

## Third Cause of Action

## Indiana Product Liability Act – Failure to Warn

110. Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

111. Prior to Plaintiff Joel Michel's initial knee surgery, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak System for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

112. Defendants had a duty to provide adequate warnings regarding the Optetrak System in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

113. Defendants had a duty to distribute, market, and/or sell the Optetrak System with adequate warnings that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

114. The warnings that accompanied the Optetrak System and corresponding packaging were defective thereby making the product not reasonably safe for its expected, intended, and/or foreseeable uses, functions and purposes.

115. The Optetrak System and corresponding packaging are not reasonably safe as labeled, distributed, marketed, delivered and/or sold by Defendants.

116. Inadequate labeling accompanying the System and packaging received by Plaintiff's implanting surgeon was a substantial factor in causing Plaintiff's injuries.

117. At all times relevant to this action, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised,

marketed, distributed, and/or sold the Optetrak System, which was implanted in Plaintiff Joel Michel, such that it was dangerous, unsafe, and defective.

118. The System was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or its sales force to physicians and patients with or about the Optetrak System failed to adequately convey the potential risks and side effects of the Optetrak System and the dangerous propensities of the device, which risks were known or were reasonably scientifically knowable to Defendants.

119. In particular, Defendants failed to adequately disclose the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, bone loss, osteolysis, and other injuries as well as the need for revision surgery in patients.

120. Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Optetrak System; and continuing to market, promote, sell and defend the Optetrak System until the recent recall.

121. Defendants knew or reasonably should have known and been aware that the Optetrak System and packaging contained inadequate warnings.

122. The inadequate warnings for the System existed when the device left the Defendants' control.

123. Plaintiff's physician implanted the System in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

124. The System as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

125. As alleged herein, Defendants knew or had reason to know that the Optetrak System caused an increased risk of harm to the Plaintiff and other consumers due to the devices' propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

126. The System that was labeled, manufactured, distributed, and sold by the Defendants to Plaintiff was in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the device, including Plaintiff.

127. The labeling defects of the Optetrak System and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

128. The labeling defects of the Optetrak System and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

129. Plaintiffs could not, by the exercise of reasonable care, have discovered these defects and perceived its dangers or avoided injury.

130. The Defendants are strictly liable for providing inadequate warnings accompanying the Optetrak System and packaging of the devices; the distribution, marketing, and/or sale of the Optetrak System; and the injuries sustained by Plaintiffs.

131.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

132.    By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

133.    As a direct, proximate and legal consequence of the defective nature of the System as described herein, Plaintiff has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

134.    As a further direct, proximate and legal consequence of the defective nature of the System, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress and pain and suffering.

**Fourth Cause of Action**

**Loss of Consortium**

135.    The Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

136.    At the time of the accident complained of in the Plaintiffs' Complaint, the Plaintiffs were husband and wife.

137.    That as a result of the wrongful and negligent acts of the Defendants, and each of them, the Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of

consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of their marital relationship.

138.    That all the injuries and damages were caused solely and proximately by the negligence of the Defendants.

WHEREFORE, the Plaintiffs jointly as husband and wife, demand judgment against the Defendants, jointly and severally, plus costs, pre-judgment interest, post-judgment interest, and any other costs this court deems appropriate.

### Demand For Jury Trial

Plaintiffs Joel Michel and Lisa Michel, by counsel, demand a trial by jury on all issues so triable.

Respectfully submitted,

FROST BROWN TODD LLP

By:   */s/ Robert B. Thornburg*
        Robert B. Thornburg, #19594-02
        Jeffrey J. Mortier, #15800-49
        Blake N. Shelby, #28064-29
        *Attorneys for Plaintiffs*

FROST BROWN TODD LLP
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
*jmortier@fbtlaw.com*
*bshelby@fbtlaw.com*
*rthronburg@fbtlaw.com*

0158898.0795605   4878-1136-0506v1

Page **26** of **26**